

**United States Court of Appeals**

*for the*
**District of Columbia Circuit**

IN RE: Eric Douglas Clark
Case No: 1:21-mj-00396
JANUARY 6TH

CRIMINAL DEFENDANTS
"Emergency" Expedited Scheduling Requested

On Petition for a Writ of Mandamus to the
U.S. District Court for the District of Columbia

*Respondent.*

*and the* U.S. Attorney's Office for the District of Columbia, *Interested Party*

PETITION FOR WRIT OF MANDANMUS and Appendix

Eric Douglas Clark
316 Minette Circle
Louisville, KY 40258
502-708-7039
guy-faux17@protonmail.com
Dated: February 27, 2023

## CIRCUIT RULE 27-3 CERTIFICATE

The Petitioners request "Expedited Consideration" treatment or so-called "Emergency" scheduling pursuant to Local Rule 27(f).

To avoid irreparable harm from pending criminal cases unfolding in violation of Constitutional due process, while also recognizing and the timetables of this Court and the need for responses and proper consideration, and the procedures in which the mailing of jury questionnaires mark a deadline by which a criminal trial is underway, decision is requested by April 21, 2023.

The telephone numbers, e-mail addresses, and office addresses of the attorneys for the parties are:  Eric Douglas Clark

316 Minette Circle

Louisville, KY 40258

(502)708-7039

guy-faux17@protonmail.com

## PETITION FOR WRIT OF MANDAMUS

I.      **INTRODUCTION**

Many or all trial judges of the U.S. District Court for the District of Columbia, as well as their law clerks and judicial staff, are residents of the District of Columbia. Those who are have a personal or legal interest in the outcome of the civil and

criminal cases relating to January 6, 2021, and cannot preside over cases related to January 6, 2021, consistent with constitutional due process.

This situation is like nothing considered before by the rules for transfer of venue and recusal, including because the District of Columbia is a very compact jurisdiction also including the national seat of the U.S. Federal Government.  The Judicial District is only 68 square miles in total.[1]

However, as the *situs* of much of the Federal Government, the District courts are busy with many cases.  By contrast, in many other Judicial districts, the geography and population are large enough and spread out enough over huge areas to minimize such concerns.  That does not mean it would be acceptable, but that the problem is highly concentrated within Washington, D.C.

According to the Attorney General of the District of Columbia, authorized to speak and in fact speaking for the entire District of Columbia, every resident of Washington, D.C., is a personal victim, directly or indirectly, of events in the District of Columbia culminating on or about January 6, 2021, to an unusual degree.

To the extent that the Attorney General avers that the finances and facilities of the District of Columbia were damaged by the events centered around January 6, 2021, every resident who pays taxes directly or through rent to a landlord (residential

---

[1] Washington, D.C. national capital, United States, Britannica, https://www.britannica.com/place/Washington-DC

or commercial) and the services that the city is able to provide are reduced due to the impact on the city's budget.

The District of Columbia has filed suit against a long list of Defendants allegedly victimizing all residents of the District of Columbia either by costing the city substantial funds, terrorizing citizens and residents of Washington, D.C., impinging their rights, and implementing a conspiracy to do the same, primarily but not exclusively on or about January 6, 2021.

Speaking for all residents and the Government of the District of Columbia, the lawsuit claims of the lawsuit include not only those who are citizens and residents of Washington, D.C., but rationally include anyone present in the District of Columbia on January 6, 2021, anyone using government services funded by the District of Columbia affected by the financial costs of events on January 6, 2021, or even "terrorized" as frequent commuters into the District of Columbia not present in the city but made afraid of their next work day in the city in light of events.

The District of Columbia filed in the U.S. District Court for the District of Columbia as Case No. 1:21-cv-03267 with Amended Complaint filed on April 1, 2022, *District of Columbia v. Proud Boys International, L.L.C.*

That and other civil cases cannot be heard by any judge of the U.S. District Court for the District of Columbia.

However, of infinitely greater significance, the Attorney General of Washington, D.C., has declared, alleged, and established on behalf of the District of Columbia that every resident – including judges – of the city was personally affected, a personal victim, of the alleged crimes and torts on or related to the events of January 6, 2021.

Therefore, all cases of any kind relating to the subject matters of *District of Columbia v. Proud Boys International, L.L.C* cannot be heard by any judge of the U.S. District Court for the District of Columbia.  Arguably, even visiting judges who are working within the city are affected by the impact on the city's budget.

The District of Columbia alleges "millions" of dollars of costs imposed upon the Metropolitan Police Department of Washington, D.C.  Therefore, the personal safety of all judges and judicial personnel are affected by the reduced budget available to the MPD in the wake of January 6, 2021.  At least that is what the District of Columbia claims in the allegations of its lawsuit. [2]

All residents of the city and those present in the city that day, were placed under a curfew on January 6, 2021.  *See*, Executive Office of the Mayor, "**Mayor**

---

[2] Rep. Angie Craig (D-Minn.) was attacked in an elevator in her Washington, D.C. apartment building near Capitol Hill in the early morning of February 9, 2023.  The attack appears to be routine crime within the District of Columbia.  If true, the District of Columbia's allegations would cause a reduction in the availability of funding for MPD and a corresponding increase in crime.  See, Karl de Vries and Clare Foran, "**Man arrested after Minnesota congresswoman assaulted in DC apartment building, police say,**" CNN, February 10, 2023, https://www.cnn.com/2023/02/09/politics/angie-craig-assault/index.html

**Bowser Orders Citywide Curfew Beginning at 6PM Today,**" January 6, 2021, accessible at: https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today . And had access to free travel within the District of Columbia highly restricted for several months due to the militarized nature of the road closures, checkpoints and vast amount of fencing erected. Therefore, every citizen or person present within the city was personally, legally affected by the events centered around January 6, 2021. This includes the Judges and judicial staff of the U.S. District for the District of Columbia.

The residents (jury pool) of the District of Columbia are overwhelmingly dependent upon employment of some member of their household by the U.S. Federal Government or by a vendor to the U.S. Government. Therefore, an overwhelming percentage of the potential juror pool is personally dependent upon the good will and good graces of the U.S. Government and maintaining the favor of those who have a clearly-expressed, oft repeated, and loudly declared agenda with regard to the events of January 6, 2021.

II.   **RELIEF SOUGHT**

The January Sixth Defendants known from hereinafter as Petitioners, respectfully requests that the Court grant its peremptory Writ of Mandamus and: (1) direct all United States District Court Judges who reside within the federal District of Columbia to immediately disqualify him / herself from all criminal proceeding

relating to the government's prosecutions of January 6, 2021, related cases and or defendants.

Petitioner seeks a writ of mandamus compelling every trial judge of the U.S. District Court for the District of District of Columbia to transfer venue of any case of any kind relating to the subject matters of *District of Columbia v. Proud Boys International, L.L.C.* to an alternative appropriate venue, presumably where the Defendants reside.

### III.   **ISSUES PRESENTED**

(a)   Whether this Court should direct the United States District Judges from the District of Columbia from presiding over cases involving criminal defendants relating to January 6, 2021, where each judge was either directly or indirectly victimized by the alleged events of January 6th, 2021, and are accordingly disqualified under the law established in *In re Murchison*, 349 U.S. 133 (1955) from presiding over his own cause.

(b)   Whether any Judge of the District can avoid the appearance of impropriety by presiding over cases related to the alleged events of January 6, 2021, while having a personal interest in the outcome of the case.

(c)   Whether it is rational to cling to a stubborn and unreasoning opposition to the easy and readily-available tool of a change of venue, particularly where the Judiciary has declared that its reputation in the eyes of the public is very important because

the public's trust is all that the Judiciary has (the Judiciary has argued on its own

initiative and in its own terms).

IV.    **STATEMENT OF FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED BY THE PETITION**

A. **Petitioners for Writ of Mandamus**

Petitioners are:

Eric Douglas Clark / Defendant / Pro Se litigant

B. **Petitioner Has No Adequate Remedy at Law**

Petitioners have no adequate remedy at law.  Many January 6 Defendants have extensively asked trial judges to transfer venue and have fully exhausted all other options and have warned District Judges about personal interests of the judge. Importantly, District Judges refuses to remove himself on the case and instead continues to flagrantly and defiantly violate 28 U.S.C. § 144 and 28 U.S.C. § 455 and the Code of Conduct for United States Judges.

Petitioners are thus left with no other remedy available to them but to compel Respondent District Judges to follow the law other than to file this petition.

C. **No Prejudice or Delay to a Pending Jury Trial**

Almost all of the many problems and reversible errors occurring in these cases are entirely unnecessary, but are caused by a mad rush of the DoJ to run to the courthouse before being ready.   The DoJ could have actually prepared its cases properly for another three years within the shortest of the statutes of limitation.

Thus, there is no prejudice after disregarding artificial, arbitrary, and capricious hunger for trying cases that are not ready for trial.

D. **Claims of the District of Columbia Attorney General**

In the progress of the civil case, the allegations will follow a certain course of proceedings. However, the District of Columbia has formally, officially, and subject to Rule 11 of the Federal Rules of Civil Procedure declared that all residents of the District Columbia were directly or indirectly affected:

> 4. The result of that planning, the January 6th Attack on the Capitol, was not a protest or a rally. It was a coordinated act of domestic terrorism.

> 5. Would-be insurgents from across the country came to the District, marched through its streets, and ultimately gathered at the United States Capitol, ready and eager to carry out a violent attack on the lawful operation of government.

> 6. Then, as the Proud Boys, the Oath Keepers, their leadership, and certain of their members and affiliates had planned, Defendants and others rioted, broke through police barricades, and physically forced their way into the Capitol. In doing so, they threatened, assaulted, and injured those who tried to stop them, including officers of the District's Metropolitan Police Department ("MPD"), and incited terror among those inside and around the building, including members of Congress who were discharging the official duties of their offices.

> 7. In the wake of this assault, the Capitol was left in shambles, with the District left to deal with the aftermath of the violent disruption to what should have been the peaceful transition of presidential power.

> 9. Through this action, the District seeks to hold the Defendants accountable under federal laws and the laws of the District of Columbia for the actions committed in furtherance of their conspiracy. The District seeks compensatory, statutory, and punitive relief, and, by filing this action, makes clear that it will not countenance the use of violence against the District, including its police officers.

> 396. One MPD officer was beaten by members of the crowd with sticks and crutches, including by one person wielding an American flag. *See* Figure 32. The MPD officer later recalled during his testimony before the House Select Committee that attackers

were lunging at him and trying to grab his gun while chanting "kill him with his own gun."

## VI. The District of Columbia Answered the Call to Provide Support during the January 6th Attack—and Was Injured as a Result.

441. In response to concerns leading up to January 6th, MPD deployed its officers on 12-hour shifts around the District. No officers were permitted to take leave on that day.

442. Other law enforcement partners such as the Metropolitan Transit Police and non-law enforcement agencies such as the District's Homeland Security and Emergency Management Agency and the Fire and Emergency Medical Services Department were also supporting these efforts.

443. The measures taken by MPD and others to prepare for January 6th were unprecedented: never before had the certification of an election required such significant allocation of law enforcement resources.

444. Nonetheless, these resources were insufficient to counter the unprecedented violent assault on the U.S. Capitol by Defendants in an attempt to halt the counting of the electoral ballots, an essential step in the peaceful transfer of the presidency.

445. As the events described above began to unfold, the Capitol Police quickly discovered that they could not defend the Capitol alone. Accordingly, at 12:58 p.m. on January 6th, the Chief of the Capitol Police asked for MPD's assistance at the Capitol.

446. MPD responded immediately, deploying several Civil Disturbance Unit Platoons.

447. By the time MPD officers arrived at the Capitol, the area was in chaos.

448. MPD officers were engaged in a battle for hours. Many were forced into hand--to-hand combat to prevent even more of the Defendants and their cohort from gaining entry into the Capitol.

449. By 2:30 p.m., MPD resources were so overwhelmed that the District had to request additional police officers from as far away as New Jersey.

### A.   MPD Officers Suffered Physical and Mental Injuries as a Result of the Defendants' Attack

450. At least 65 MPD officers reported sustaining injuries as a direct result of the January 6th Attack.

451. One officer was beaten in the face, including with his own baton, which was stripped from him by Defendants and their co-conspirators. The same officer was also hit by a metal pole that was hurled at him, causing a concussion and permanent

injuries to his head and neck. The officer died by suicide after struggling with severe depression and brain injuries caused by the concussion.

452. Another officer was electrocuted multiple times as he was beaten unconscious by the crowd while screaming for help. While the crowd was beating him with fists and hard metal objects, they shouted "kill him with his own gun" and stripped his badge, radio, and ammunition from his body. As a result of his injuries, he lost consciousness for more than four minutes.

453. Other officers' physical injuries ranged from bruised arms and legs, swollen ankles and wrists, and lacerations, to more serious damage such as irritated eyes and lungs from sprayed chemicals, cracked ribs, shattered spinal discs, wounds from being hit with a metal fence stake,
and injuries from head blows from various objects, including metal poles ripped from inauguration-related scaffolding and an American flagpole. 454. Officers also suffered extensive psychological injuries. Dr. Beverly Anderson, a therapist who serves as the clinical director of the Metropolitan Police Employee Assistance Program, has worked with nearly 1,000 officers since the January 6th Attack in an effort to help them cope with the physical and emotional trauma caused by the Defendants and their cohort. During the course of her work, Dr. Anderson discovered that some officers suffered head traumas as a result of the Attack that had previously gone undiagnosed.

455. The effects of these wide-ranging injuries are severe and sustained over time. Some officers were still on leave months after the Attack as a result of the trauma they suffered at the Defendants' hands.

**B. The District Has Incurred Significant Damages as a Result of Defendants' Unlawful Actions**

456. For the District, the fiscal costs of this Attack—which are directly attributable to the Defendants' calculated, pre-planned, and coordinated actions—have been steep.

457. The Defendants' actions necessitated an unprecedented deployment of MPD resources. During the height of the Attack, approximately 850 MPD officers were at the Capitol; by the day's end, approximately 250 additional MPD officers were in the area to support the
response and aftermath. These numbers far exceed the number of officers necessary for the MPD's usual duties, including usual duties carried out during non-violent rallies and protests, and the costs to the District arising from this expansive deployment of MPD resources was significant.

458. The District also incurred costs related to the emergency and other medical care provided to MPD officers who were injured as a result of the Defendants' actions. Dozens of MPD officers formally reported and were treated for injuries resulting from the Defendants' Attack.

Many MPD officers also required—and in some cases, still require—mental health care following the traumatic events that unfolded during the Attack. The District expects to pay for continued medical care for these officers as necessary going forward, including care related to the impact of the Attack on MPD officers' mental health.

459. While the costs to the District are still being investigated and tallied, ***the District has preliminarily estimated that MPD incurred millions of dollars in costs during the week of January 6th alone.***   *[Emphasis added.]*

E.  **Interests of Petitioners**

1.    The Petitioners are resident from all across the Constitutional United States.

2.    The Petitioners are defendants wrongly charged from events on or related to January 6, 2021, or the Court would recognize from the case files at least vastly over-charged, who are objectively innocent of some or all of the many counts of crimes charged against them.

3.    In many of the related criminal prosecutions of these events, January 6 Defendants have often proven their innocence beyond any reasonable doubt, proving that the criminal allegations are intentional falsehoods, speculation, dubious interpretations, or incorrect assumptions by the U.S. Department of Justice as confirmed by video evidence and/or that the allegations are chronologically impossible such as causing events before Defendants arrived, yet juries of the District of Columbia have convicted many Defendants on records of clear and undeniable innocence.

4. The politically charged events in the District of Columbia, on January 6, 2021 were fostered by what could be argued as, the most heated and socially divisive general election season in the nation's history. The racial, social, and political divisiveness which resulted from the presidential campaigns between Donald Trump, and Joseph Biden, enabled political bias to infect every facet of the American societal infrastructure to include but not limited to: livelihoods, freedoms, personal health, private business, childhood education, transportation and commerce, legislation, military affairs, law enforcement, and even the federal courts. Further, many individuals who lived in, or worked within the District of Columbia, appear to have taken personal offense towards the U.S. Capitol protestors from January 6th, as though the political event involving the Capitol protestors was a direct attack taken against the local District of Columbia residents themselves. The District Judges of D.C., being of such residences or employees.

5. Similarly situated protests that actually did involve widespread violence and property destruction have been excused by the U.S. Department of Justice, with charges routinely dropped against Left-wing protestors.  In fact, the DoJ paid Left-wing protestors millions of dollars to settle lawsuits.[3]

---

[3]    *See*: Aila Slisco, "Government Settles Civil Cases With Protesters Injured at Lafayette Square," NEWSWEEK, April 13, 2022, accessible at:  https://www.newsweek.com/government-settles-civil-cases-protesters-injured-lafayette-square-1697820

6.  It is a demonstrated reality that Petitioners and other January 6 Defendants cannot receive a fair trial in the District of Columbia.

7.  In the Summer of 2020, anarchists and ANTIFA protestors threatened the White House – the command center of the Free World – and obstructed the President's conduct of official business, including as world-wide Commander in Chief and leader of foreign policy globally.[4]  Yet, despite the proven violence of protestors attacking the White House and police with bricks, **_frozen_** water bottles, etc., the DoJ dropped the charges and paid millions of dollars to the protestors.[5] The use of frozen water bottles is especially egregious, even destruction of evidence, because the dangerous weapon melts before it can be used as evidence of the crime.  Protestors burned the "Church of the Presidents" and set fires throughout Lafayette Park.[6]

8.  But the selective prosecution and disparate treatment based purely on politics cannot be unseen by the public.

---

[4]     "Trump took shelter in a White House bunker as protests raged,"  CNBC News, June 1, 2020, https://www.cnbc.com/2020/06/01/trump-took-shelter-in-a-white-house-bunker-as-protests-raged.html

[5]     Jan Wolfe and Ismail Shakil, "U.S. settles with Black Lives Matter protesters violently cleared from White House park," Reuters, April 13, 2022, https://www.reuters.com/world/us/us-justice-dept-settles-cases-related-police-response-dc-anti-racism-protests-2022-04-13/

[6]     Melissa Barnhart, , "Historic St. John's Church near White House torched by rioters," Christian Post, June 1, 2020, accessible at:  https://www.christianpost.com/news/historic-st-johns-episcopal-church-set-on-fire.html



F. **Mandamus Required for Recusal of All District Judges, Requiring Transfer of Venue of January 6 Criminal and Civil Cases**

Therefore, all cases relating to the events culminating on January 6, 2021 whether civil or criminal, cannot be heard before any of the Judges of the U.S. District Court for the District of Columbia.  Therefore, the cases must be transferred to the next most applicable venue under existing venue rules.

V.      **GOVERNING LAW:  MANDAMUS ON FAILURE TO RECUSE FOR DISQUALIFICATION**

Initially, venue is also unlike almost any other error normally considered to be appealable only after conviction and after sentencing.  The appellate courts avoid considering errors that *might* not be material as being premature, on the thought that

perhaps the Defendant will be found not guilty and the error will not matter.  This is most properly designated as premature or not ripe.

A trial fully conducted in a venue that does not satisfy constitutional due process, however, is not just ripe but over-ripe, if one may coin a phrase.  The entire trial would need to be thrown out and an entirely new trial would have to be conducted in a correct venue.  The problem is a fundamental denial of the constitutional right of due process.  This is also about a fair trial and the public appearance of a fair trial.  Regardless of the outcome of the trial, the defendant may still be denied a fair trial.  The public may nurse or express a sense of unfairness as well.

Courts have consistently held that a colorable constitutional violation gives rise to a showing of irreparable harm. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections "'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *see also Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 (D.D.C. 2002) (deprivation of constitutional protection "is an undeniably substantial and irreparable harm").

[Federal Rules of Criminal Procedure]  Rule 21. Transfer for Trial

(a) FOR PREJUDICE. Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists

in the transferring district that the defendant cannot obtain a fair and
impartial trial there

The Sixth Amendment to the United States Constitution grants criminal

defendants the right to a fair trial by an impartial jury. *Duncan v. Louisiana*, 391

U.S. 145 (1968). ―The great value of a trial by jury certainly consists in its

fairness and impartiality.‖*United States v. Burr*, 25 F. Case. 49, 51 (CC Va. 1807).

An impartial jury is required under the Constitution and has been required since the

times of common law. Id.; see also *Patton v. Yount*, 467 U.S. 1025 (1984).

A criminal trial ordinarily should take place in the district where the offense

was committed. U.S. Const. amend. VI; Fed. R. Crim. P. 18.  Here, of course, the

prosecution DoJ contends in many cases and in many counts that the crimes

charged were committed all over the nation in the form of conspiracy, planning,

etc.  In some cases, most of the elements of the crimes charged are alleged to have

occurred in various other States.

But if extraordinary local prejudice in Washington, D.C.,  will prevent the

defendant from obtaining a fair trial in the district of the offense, then due process

requires transferring the trial to another appropriate alternative venue. *Skilling v.*

*United States*, 130 S. Ct. 2896 (2010).

Rule 21 allows a defendant to initiate a motion, dependent upon the court's

discretion, for transfer of a criminal case for trial in another district, if (a) the

atmosphere is so prejudicial the defendant cannot obtain a fair and impartial trial

within the district in which the action is brought or (b) for the convenience of the

parties and witnesses, if in the interest of justice. The purpose of the rule is to

secure a fair trial to the defendant when circumstances in the district where the

action is brought would place an undue risk of unfairness upon the defendant if

tried within that district. *Sheppard v. Maxwell*, 384 U.S. 333 (1965).

Federal Rule of Criminal Procedure 21 (a) states, in pertinent part, that upon

a defendant's motion, the court ***must*** transfer the proceeding against that defendant

to another district if the court is satisfied that so great a prejudice against the

defendant exists in the transferring district that the defendant cannot obtain a fair

and impartial trial there. See *United States v. Ayala*, 64 F. Supp. 3d 446, 450

(E.D.N.Y. 2014).

Although cases granting motions to transfer under Rule 21(a) are rare, the

circumstances mandating the transfer in this case are unprecedented and require

such a result. Petitioners observe that if a judge-made tradition of intransigence to

transfers of venue, there should be a reconsideration and change in the law.  All

assumptions and doubts should be resolved in favor of a transfer of venue when (a)

the constitutional rights of the Defendants are not discretionary or optional but are

the Supreme Law of the Land overshadowing all other considerations particularly

mere matters of housekeeping or logistics, and (b) the public's confidence that

justice has been done and that the legal system actually is fair is greatly more

important than convenience and logistical arrangements for a trial, and (c) the Government makes a decision whether to bring a criminal charge; if that cannot be carried through consistent with the Constitution and the public's confidence, the Government has the option of not bringing the case.

Criminal law for many centuries here and in England and other countries informing the United States of America include the foundational assumption that it is better to get a presumed criminal "next time" than to bend or break the rules "this time." (And we observe that there usually is a next time if the person actually is guilty, actually is criminally minded, otherwise very probably not.)

The courts have recognized two types of prejudice that support a motion to transfer venue: presumed prejudice and actual prejudice. *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (quoting *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996)). Presumed prejudice refers to the conditions that exist before trial in the district in question; the court will typically consider in this regard whether there was a barrage of inflammatory publicity, whether news accounts were factual or opinionated, whether those accounts included material that would not be admissible, the size of the overall jury pool, and the availability of judicial tools to mitigate the prejudicial effect of pretrial publicity. Prejudice may be presumed —when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime.

*Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988). Prejudice should be

presumed in only extreme cases. *Harris*, 885 F.2d at 1361 (presumed prejudice is

—rarely applicable and —reserved for an extreme situation‖).

The Supreme Court has overturned convictions where the district court

failed to transfer for venue after prejudicial pretrial publicity. See e.g. *Rideau v.*

*Louisiana*, 373 U.S. 723 (1963); *Estes v. State of Texas*, 381 U.S. 532 (1965);

*Sheppard v. Maxwell*, 384 U.S. 333 (1966). The Supreme Court has also reversed

convictions where there was a —huge…wave of public passion‖ and where the

venire possessed —a belief in [defendant's] guilt. *Irvin v. Dowd*, 366 U.S. 717,

728 (1961)(vacating a conviction and death sentence for the trial court's failure to

transfer venue for community publicity); see also *Patton v. Yount*, 467 U.S. 1025

(1984).[7]

Pursuant to 28 U.S.C. § 144:

> Whenever a party to any proceeding in a district court makes and
> files a timely and sufficient affidavit that the judge before whom
> the matter is pending has a personal bias or prejudice either
> against him or in favor of any adverse party, such judge shall
> proceed no further therein, but another judge shall be assigned to
> hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief
> that bias or prejudice exists, and shall be filed not less than ten

---

[7]     This portion of the Governing Law owes much to Enrique Tarrio's Motion to
Transfer Venue and Memorandum of Law, Case No. 1:21-cr-00175-TJK, by
Sabino Jauregui and Nayib Hassan, as being especially well drafted and researched
among all those similar motions surveyed for this Petition.

days before the beginning of the term at which the proceeding is
to be heard, or good cause shall be shown for failure to file it
within such time. A party may file only one such affidavit in any
case. It shall be accompanied by a certificate of counsel of record
stating that it is made in good faith.

Mandamus is a proper remedy for the refusal of a judge to recuse himself,

although some Circuits hold that mandamus applies pursuant to 28 U.S.C. § 455

rather than 28 U.S.C. § 144.  *In re: School Asbestos Litigation*, 977 F.2d 764

(C.A.3 (Pa.), 1992); *In re:  International Business Machines Corp.*, 687 F.2d 591

(C.A.2, 1982).  *See, also,* Cynthia Gray, "The Line Between Legal Error and

Judicial Misconduct: Balancing Judicial Independence and Accountability," 32

Hofstra L. Rev. 1245 (2004).

The U.S. Courts of Appeals for the First, Fifth, Sixth, Tenth, and Eleventh

Circuits have said that close questions should be decided in favor of recusal. *See*

*Republic of Pan. v. American Tobacco Co*., 217 F.3d 343, 347 (5th Cir. 2000)

(citing *In re Chevron*, 121 F.3d 163, 165 (5th Cir. 1997)); *In re United States*, 158

F.3d 26, 30 (1st Cir. 1998); *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995);

*United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993); *United States v. Kelly*,

888 F.2d 732, 744 (11th Cir. 1989).

In *SCA Servs. v. Morgan*, 557 F.2d 110 (7th Cir. 1977), mandamus was

ordered for disqualification because of the personal interests of the judge.  There,

the judge's brother was an attorney in the firm appearing before the judge. Similar

to the relationship between District Judges and his wife in the case at bar: "This appearance of partiality begins with the natural assumption that brothers enjoy a close personal and family relationship and, consequently, would be inclined to support each other's interests. When one's brother is a lawyer in the firm representing a party before his brother who is the judge in the case, the belief may arise in the public's mind that the brother's firm and its clients will receive favored treatment, even if the brother does not personally appear in the case." *Id.* at 116. The U.S. Court of Appeals for the Seventh Circuit also found that "the judge's 'Memorandum of Decision' suggests that he made a confidential inquiry, presumably to his brother, to determine in what capacity Donald A. Morgan was involved in this case (Petitioner's App. D-3). Counsel were not present and were unaware of the inquiry at the time it was made. While it is understandable why the judge may have felt his brother could present the most accurate evidence as to his role in the pending litigation, the judge's inquiry creates an impression of private consultation and appearance of partiality which does not reassure a public already skeptical of lawyers and the legal system." *Id.* The Seventh Circuit granted a petition for writ of mandamus requiring the trial court to abstain from presiding over further proceedings.

The same situation appears here. District Judges will have access to his wife's explanation outside of court as to whether she did or did not make the

statement at issue and has a personal interest regarding his wife.  He also admits on

the record to having conducted his own factual investigation outside of the

courtroom.

In *In re Faulkner*, 856 F.2d 716 (5th Cir. 1988), the U.S. Court of Appeals

for the Fifth Circuit reversed a refusal to recuse where a relative of the judge was a

major participant in transactions relating to the defendant's indictment and "that

relative had communicated to the judge . . . material facts and her opinions and

attitudes regarding those facts." *Id.* at 721.

Also on point is *In re Aetna Casualty & Surety Co.*, 919 F.2d 1136 (6th Cir.

1990), where the U.S. Court of Appeals for the Sixth Circuit, sitting en banc,

required recusal. The trial judge initially recused himself because his daughter's

law firm represented four of the claimants. The judge later separated the cases and

planned to try the three claims in which his daughter's firm was not involved. On

mandamus petition the court reversed: A "decision on the merits of any important

issue in any of the seven cases . . . could constitute the law of the case in all of

them, or involve collateral estoppel, or might be highly persuasive as precedent."

*Id*. at 1143. The court did not specify whether it based its decision on section

455(a) or section 455(b)(5)(ii), but a concurring opinion, joined by seven judges,

emphasized that there was an actual conflict of interest under section 455(b)(5) as

well as an appearance of partiality.

Moreover, the Code of Conduct for United States Judges governs:

**CANON 2** requires:

\* \* \*

(B) Outside Influence. A judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge. A judge should not testify voluntarily as a character witness.

**CANON 3** requires:

\* \* \*

(C) Disqualification.
(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which:
(a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

\* \* \*

(c) the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be affected substantially by the outcome of the proceeding;
(d) the judge or the judge's spouse, or a person related to either within the third degree of relationship, or the spouse of such a person is:

\* \* \*

(iii) known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or
(iv) to the judge's knowledge likely to be a material witness in the proceeding;

Also pursuant to 28 U.S.C. § 455:

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

* * *

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding;

(5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i) Is a party to the proceeding, or an officer, director, or trustee of a party;

(ii) Is acting as a lawyer in the proceeding;

(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;

(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.

* * *

Recusal or disqualification is required when judicial conflicts create the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism' to defendants' position that 'fair judgment is impossible.' *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994). The courts strive to

eliminate even the appearance of bias. "Thus even if there is no bias in fact, an appearance of bias or prejudice requires recusal if it is sufficient to raise a question in the mind of 'the average citizen' about a judge's impartiality." *York v. United States,* 785 A.2d 651, 655 (D.C. 2001).

VI.    **ARGUMENT:  STATEMENT OF REASONS WHY THE WRIT SHOULD ISSUE**

A. **Transfer of Venue is an Easy, Simple, Viable Solution which Should Always be Preferred to Maintain the Public's Confidence**

No valid reasons exist to resist a transfer of venue other than sheer inertia.  Put another way, transfers of venue are disfavored because they are disfavored, not for any underlying or genuine reason.  It looks to the public upon whose trust and respect the Judiciary has always claimed to rely as mere obstinance or a contrarian attitude. Within business and the Executive Branch, there is a joke "Not invented here" meaning that any idea must be automatically resisted because it was someone else's suggestion.  It might be a good idea but it wasn't "my" idea.  That's what the federal courts attitude on venue looks like to the public.

Rather, a transfer of venue should be the default position.  Where any questions about the fairness of a trial can be easily cured, it should be cured.  Too much intellectual energy is consumed trying to resist the obvious.

Here, in the flood of criminal and civil cases related to the events concentrated on January 6, 2021,[8] the DoJ is calling upon Assistant U.S. Attorneys from around the country.  In one recent trial, *United States v. Richard Barnett,* 1:21-cr-00038, the lead prosecutor at least pre-trial **_was from Tampa, Florida_**.

Given that prosecutors are being detailed to January 6 cases from around the country, there is no reason for them to be detailed to the District of Columbia rather than to venues free of public doubt and bad appearances.  AUSAs could be detailed to these cases in their home cities where the trial is being held.

Some visiting judges are being brought in to Washington, D.C.  Why don't we allow them to simply remain where they are instead of leaving their families for possibly weeks at a time and costing the Government hotel fees, unlikely to be discount motels in all fairness?

While it is true that some witnesses would have to travel to a different venue, many of them have to travel to somewhere in any event.

---

[8]     The DoJ has chosen to break with all past norms where usually minor players would be assessed only $50 fines – such as the September 2018 insurrection against Brent Kavanaugh, taking over and occupying the Hart Senate Office Building and disrupting hearings of the U.S. Senate Judiciary Committee – while prosecuting those who committed serious crimes, violence, assault, or who organized the events.  The DoJ's break with past norms has created unique situations here.  The DoJ has merely assumed it seems without much thought that the U.S. District Court for the District of Columbia alone out of the entire nation can absorb in excess of 1,000 cases and reported an expected 1,000 to 2,000 more cases from January 6, 2021, suddenly added to the District Court's normal workload.  It is hard to argue that only this District should bear that burden alone out of the entire nation.

None of the January 6 Defendants are residents of Washington, D.C., and almost none of them from the Greater Washington, D.C. region.

Much of the criminal charges alleged involve actions around the country alleged to be conspiracy overt acts or preparations for actions on January 6, 2021. Even where witnesses or evidence may exist in Washington, D.C., there often is no such evidence as promised by the DoJ or the DoJ resists disclosure of any evidence existing in D.C.  For example, the DoJ alleges damage to property, but won't identify what property it alleges is damaged or its value.  While the DoJ could argue that the evidence is in D.C., *the evidence isn't in D.C., either.*  It is systematically being withheld and hidden from Defendants.

Nearly the entirety of January 6 evidence consists of video recordings entered without a witness sponsor and "news reader" or "case agent" FBI personnel who have no personal knowledge of events but merely read the case file into the record before the jury, with no foundation of personal knowledge, and answer in cross-examination that they don't know anything but what they read.   Videos are dominating the trials, under strained use of new rules for digital evidence, without any witness as to who recorded the video.  Instead of an authenticating sponsor, the DoJ is calling opinion commentators to talk over the videos, by witnesses who have no personal, first-hand knowledge of anything in the videos.  However, in terms of

venue, a video can be played to the jury just as easily in the Judicial District where Defendants reside as in the District of Columbia.

One of the many controversies in the Oath Keepers trial of *United States v. Stewart Rhodes, et al.* was the Honorable District Court Judge Amit Mehta's repeatedly-expressed concerns that the E. Barrett Prettyman courthouse lacked enough large courtrooms. The sheer number of January 6 cases being tried in D.C. has – from listening to Judge Mehta's concerns – a serious impediment to hearing the cases. The Oath Keepers Defendants wanted to all be tried together as one group to the level of their views of constitutional due process because of the risk of witnesses testifying inconsistently from one trial to the next or altering their testimony. Judge Mehta responded to repeated motions and discussions by observing that the calendar of available courtrooms was more constrained even than his schedule as a judge and that the one and only large courtroom had very limited availability.

Therefore, where the crush of workload from all the January 6 cases intensively concentrated in only one courthouse out of the entire nation argues for transfers of venue.

Therefore, the usual considerations of the location of evidence or witnesses and the like do not apply, but in fact argue the other way here. The usual factors of the locus of evidence and witnesses are not applicable in these cases.

Assuming that a witness is scheduled to testify after lunch, he could fly to Dallas Fort Worth or Tampa, Florida in 3 ½ hours and be back home the same day in the late evening.

This Court should not indulge in artificial, arbitrary, or capricious resistance to a readily-available tool to comply with the Constitutional rights of due process and avoid the appearance of impropriety in the public's view.

The courts are obligated to transfer venue, order recusal, and/or disqualify a potential juror based upon a personal legal interest, no matter whether large or small, and without discretion.  If an airplane crashed across town it is highly likely that jurors who live nearby would be unusually influenced and affected and could not – regardless of assurances or honest self-belief – serve as an impartial juror.  Such voters and potential jurors could certainly not avoid the appearance of impropriety by the judge selecting them in the eyes of the public.  However, if the airplane landed on the juror's house, the law could not allow that person to serve as a juror.  Even if a saintly Christian or other religious adherent devoted to forgiveness and staying free of bitterness, we would never accept assurances that a person who assures us he can be impartial in a lawsuit against the pilot who crashed his airplane into the juror's house.  Personal interest large or small without judicial discretion or evaluation would automatically create disqualification.

Similarly, if a potential juror were a victim of a mugging and stabbing, perhaps formally adjudicated and proven, we would never allow such a personally-affected juror to sit on a criminal prosecution for a different mugging and stabbing. Like it or not, and most people really don't want to accept it, human beings are complex. A juror can assure us that they will be impartial but then feel enraged in the middle of the details from an emotional reaction to their own past experiences.

### B. **Mythical Powers of *Voir Dire* are Over-Estimated**

Meanwhile the courts have presumed, without much in the way of evidence, that all things can be cured by *voir dire*. This excessive confidence in the powers of a judge to cure bias is unwarranted. A perfect jury selection *voir dire* merely selects the least biased jury in a (hypothetically) biased jury pool – not an unbiased jury. Worse, *voir dire* suffers from many defects, including the possibility of those who wish to avoid jury duty feigning bias and those who accept jury duty potentially feigning impartiality or being unaware of their implicit bias.

Such subconscious bias is made more serious by the complexity of legal cases. The average lay person may sincerely belief that they have not prejudged the case and are open to different points of view, but not appreciate ahead of the trial how the complexity of the law and the facts are affected by whether one has an open mind. Far from being a magic elixir, *voir dire* can only find the best of a bad situation.

Meanwhile, the weaknesses of *voir dire* in these cases is made worse because the jury pool in Washington, D.C. is relatively small.  Voter registration (the jury pool) is only 518,845 voters.  The assumption that there is an ability to weed out the least biased jurors is compromised when there are 1,000 cases that have been brought and announcements of another 1,000 to 2,000 more cases expected to be filed.

As Tarrio cites, an informative study is:  Kerr, N L, et al. "On the Effectiveness of Voir Dire in Criminal Cases With Prejudicial Pretrial Publicity: An 64 Empirical Study", Am. University Law Review, vol. 40, no. 2, 1991, pp. 665–701, https:// www.ojp.gov/library/abstracts/effectiveness-voir-dire-criminal-cases-prejudicial-pretrialpublicity-empirical.

C. **Jurisdiction is Proper Under the All Writs Act., 28 U.S.C. § 1651.**

This Court has jurisdiction under the All Writs Act, 28 U.S.C. § 1651. The All Writs Act is invoked by federal courts of appeals to a district judge, or by the Supreme Court to issue a writ to a lower court judge. *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980).

The All Writs Act states:

The Supreme Court and all courts established by Act of Congress may issue all writs necessary and appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651.  "The authority of federal courts to issue writs of mandamus is derived from the All Writs Act, 28 U.S.C. § 1651." *United States v. Bell*, 2008 U.S. Dist. LEXIS 91803, 7-8 (E.D. Tenn. Sept. 29, 2008) *citing In re Parker*, 49 F.3d 204, 206 (6th Cir. 1995). Mandamus is defined as "[a] writ issued by a superior court to compel a lower court or a government officer to perform mandatory or purely ministerial duties correctly." *Coles v. Granville*, 448 F.3d 853, 861 n. 2 (6th Cir. 2006) (citing Black's Law Dictionary p. 973 (7th ed. 1999). Mandamus is a remedy to be invoked in extraordinary situations where the petitioner can show a clear and indisputable right to the relief sought. *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661-62, 98 S. Ct. 2552, 57 L. Ed. 2d 504 (1978); *Kerr v. United States District Court*, 426 U.S. 394, 402-03, 96 S. Ct. 2119, 48 L. Ed. 2d 725 (1976).

The case at hand is precisely one of those "extraordinary situations" that the court in *Will* described.  Petitioners and similarly-situated Defendants have been subject to repeated violations of constitutional. It is mandatory that Respondent District Judges remove themselves from the proceedings, yet they defiantly refuse to do so and continues to issue orders that have caused and will cause more irreparable damage to Petitioner.

### D.  Cases Must Be Transferred to Another Judge in Another Venue

For a United States judge, recusal and/or disqualification are mandated by statute under 28 U.S.C. § 144.  The language of the statute does not leave any room

for discretion.  The judge "*shall* proceed no further therein." If an affidavit meets the rule's standards, the judge *has a duty* to recuse himself. *Morse v. Lewis*, 54 F.2d 1027, 1031 (4th Cir.), cert. denied, 286 U.S. 557, 76 L. Ed. 1291, 52 S. Ct. 640 (1932) (emphasis added).

Petitioner, with well-documented showings of extra-judicial bias and conflicts of interest by District Judges, filed a timely affidavit and that of ethics expert Professor Ronald Rotunda in an attempt to have District Judges remove himself from the proceedings, as provided by 28 U.S.C. § 144. *See* Exhibits 1, 2.

Recusal is a mandatory act, and therefore "ministerial" within the law of a writ of mandamus.  There is no requirement for any subjective decision.

> The disqualification statute, 28 U.S.C. §144, is **mandatory and automatic**, requiring only a timely and sufficient affidavit alleging personal bias or prejudice of the judge. The judge is a silent defendant, unable to make findings on the truth or falsity of the affiant's allegations, and truth must be presumed. *United States v. Hanrahan*, 248 F. Supp. 471, 474 (D.D.C. 1965)(Emphasis added); and the allegations may be based upon information and belief, *Berger v. United States*, 255 U.S. 22, 34, 65 L. Ed. 481, 41 S. Ct. 230 (1920).

*Brotherhood of Locomotive Firemen & Enginemen v. Bangor & Aroostook Railroad Co.*, 380 F.2d 570, 576 (D.C. 1967).

Nothing can create more of the appearance of a conflict of interest than when a presiding judge has a personal interest in the litigation or matters related to it.  The applicable standard for recsual is whether a judge's participation in a lawsuit will create the *appearance* of bias and prejudice. *See Liteky v. United*

*States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)); *Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38, 40 (D.D.C. 2001), *supra*.

Recusal is required when there is even the appearance that the court's impartiality may be called into question, and "could suggest, to an outside observer, such a 'high degree of favoritism or antagonism' to defendants' position that 'fair judgment is impossible.'" And, indeed much more than an appearance of extra-judicial bias and conflicts of interest are at issue here. *Liteky v. United States*, 510 U.S. 540, 555, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)); *See also Jackson v. Microsoft Corp.*, 135 F. Supp. 2d 38, 40 (D.D.C. 2001) (recusal was proper because the judge "ha[d] created an appearance of personal bias or prejudice").

As explained in the legal opinion of Professor Ronald Rotunda, an expert on Professional Responsibility and Constitutional Law, District Judges now have – by his own admission – an incurable personal interest in the case.

Pursuant to Code of Conduct Canon 2(B) and Canon 3(C)(1)(d)(iii) and 28 U.S.C. § 455(a), District Judges's impartiality may reasonably be questioned, because the Judge has a personal interest running an inquiry concerning possible investigations of himself and his family, and also, according to Professor Rotunda, because the transcript indicates District Judges investigating matters on his own outside of the evidentiary hearing.

In addition and separately, the language of the Judicial Code leaves no doubt that that recusal process is to be self-executing, as the judge should not unethically wait for a recusal motion to be filed.

> It [the Code of Conduct] is intended to be used by a judge at the start of each case as a checklist to assist in deciding whether at that point he should disqualify himself from any participation in the proceedings . . . [E]ven before appraising participation in the case under the [Judicial Code], the judge should first consult his own emotions and conscience, and pass an 'internal test of freedom' from disabling conflicts.

Leslie W. Abramson, Judicial Disqualification Under Canon 3 of the Code of Judicial Conduct 10 (2d ed. 1992).

An impartial judiciary is a fundamental component of the system of justice in the United States. The right to a "neutral and detached judge" in any proceeding is protected by the Constitution and is an integral part of maintaining the public's confidence in the judicial system. *Ward v. City of Monroeville*, 409 U.S. 57, 61-62 (1972). *See also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980) ("powerful" constitutional interest in fair adjudicative procedure). Congress has sought to secure the impartiality of judges by requiring them to step aside, or in some instances, disqualify themselves, in various circumstances.

"In order to preserve the integrity of the judiciary, and to ensure that justice is carried out in each individual case, judges must adhere to high standards of conduct." *York v. United States*, 785 A.2d 651, 655 (D.C. 2001). "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be

questioned . . ." ABA Code Of Judicial Conduct Canon 3(C)(1) *see also Scott v. United States,* 559 A.2d 745, 750 (D.C. 1989) (en banc).

VII.   **CONCLUSION**

The only resolution possible is for the Circuit Court to order by mandamus that the District Court's judges recuse themselves from civil and criminal cases relating to the events of January 6, 2021, which then requires those cases to be transferred to the next most applicable venue under standard, existing venue rules.

Dated:  February 27, 2023             Respectfully submitted,

/s/ Eric Douglas Clark[9]

Pro se defendant

---

[9] This document was signed and filed electronically by pro se defendant Eric Douglas Clark by standby counsel John Machado per Mr. Clark's direction.

## **CERTIFICATE OF COMPLIANCE**

I certify that this petition complies with the page limitations of Fed. R. App. 21(d), and that this petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman style.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2023, I, upon my direction to standby counsel, electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, I hereby certify that I have served the following in the manner indicated:


Judge Mehta


<u>/s/ Eric Douglas Clark</u>