UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA   : | |
| : | |
| v.   : | Criminal No. 1:22-cr-00409-APM-1 |
| : | |
| ERIC DOUGLAS CLARK   : | |
| : | |
| **Defendant.**   : | |

**UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION FOR A WRIT OF MANDAMUS [ECF No. 60]**

The United States of America respectfully submits this opposition to Defendant Eric Douglas Clark's Motion for a Writ of Mandamus (ECF No. 60). A writ of mandamus is inappropriate here. The petition is styled as a filing before the United States Court of Appeals for the District of Columbia Circuit, yet was filed in the District Court. A writ of mandamus is the wrong legal vehicle to address the defendant's complaints. The defendant does not seek the forced compliance of a clearly defined ministerial duty. Rather, the government suggests, the defendant's motion is really a motion for a change of venue as well as a motion to recuse. Both those motions are inappropriate here as well, and the Court should deny the motion as written.

Given that the defendant has not elected, or waived, a trial by jury, the defendant's motion to change venue based upon his claim that the Court cannot empanel a fair jury is not ripe. Further, the defendant has not met his burden and has not demonstrated that recusal is appropriate here. Worse, the defendant's broad attack on the District Courts of the District of Columbia would require that every Court assigned to a January 6 case recuse itself, and that no Judge whoever had any incidental contact with the District of Columbia could hear any January 6 case.[1]

---

[1] The government has charged approximately 999 individuals with crimes related to events at the United States Capitol in the Superior Court of the District of Columbia and the District Court

## PROCEDURAL BACKGROUND

For his involvement in the events of January 6, 2021, the defendant was charged via complaint with four misdemeanor offenses related to the events at the United States Capitol on January 6, 2021: entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(l); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  On December 6, 2022, the defendant filed a motion to Change Venue, amongst other motions.  See ECF No. 49.  On December 19, 2022, the government filed its opposition to the Motion to Change Venue.  ECF No. 54.  On December 19, 2022, the government also filed an Information charging the defendant with the same four misdemeanor offenses.  ECF No. 56.

These charges stem from Clark's conduct at and in the U.S. Capitol on January 6, 2021, as a Joint Session of Congress convened to certify the 2020 U.S. Presidential Election.  The Capitol Building and exterior grounds were closed to the public and surrounded by law enforcement officers, barricades, and signage.  As the congressional session convened, Clark and others breached the barricaded perimeter and charged the Capitol Building.  Video footage depicts Clark entering the Capitol Building through the Senate Wing door at approximately 2:50 pm.

---

of the District of Columbia, which share a jury pool. *See* "26 Months Since the Attack on the Capitol", Press Release of United States Attorney's Office (March 6, 2023) (available at https://www.justice.gov/usao-dc/26-months-jan-6-attack-capitol).  Of these, approximately 590 have already been convicted at trial or pleaded guilty. *Id*.  Although individuals continue to be charged, as with the cases that have been brought so far, many will be resolved in ways other than a jury trial.  Thus, the defendant's estimates concerning the number of jurors needed and the strain on the court is overstated.



On February 27, 2023, the defendant filed his Motion for a Writ of Mandamus. ECF No. 60. In that motion, the defendant asks the Court[2] to (1) "direct all United States District Court Judges who reside within the federal District of Columbia to immediately disqualify" themselves from handling any January 6, 2021 cases and (2) to compel "every trial judge of the U.S. District Court for the District of District of Columbia to transfer venue of any case of any kind relating to the subject matters of *District of Columbia v. Proud Boys International, L.L.C.* to an alternative appropriate venue, presumably where the Defendants reside." ECF No. 60, pgs. 6-7.

I.   **Defendant's request for a Writ of Mandamus is improper**

According to traditional doctrine, a writ of mandamus will issue "only where the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined. The law must

---

[2] The Motion for a Writ of Mandamus is styled as a pleading before the "United States Court of Appeals for the District of Columbia Circuit" and purports be a pleading on behalf of all or many January 6, 2021 defendants apparently without their consent or approval. ECF No. 60, pg. 1. Nevertheless, the pleading was filed in the District Court in this case. The government has searched PACER and no similar or related pleading has been filed in the United States Court of Appeals for the District of Columbia Circuit.

3

not only authorize the demanded action, but require it; the duty must be clear and undisputable." *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931), quoted in *13th Regional Corp. v. U.S. Dep't of Interior,* 654 F.2d 758, 760 (D.C. Cir. 1980). The government concedes that the District Court has mandamus jurisdiction under certain circumstances. *See Weber v. United States*, 341 U.S. App. D.C. 128, 209 F.3d 756, 759 (D.C. Cir. 2000). Nevertheless, the remedy of mandamus "is a drastic one, to be invoked only in extraordinary circumstances." *Allied Chemical Corp. v. Daiflon, Inc*., 449 U.S. 33, 34, 101 S. Ct. 188, 66 L. Ed. 2d 193 (1980). Only "exceptional circumstances amounting to a judicial 'usurpation of power'" will justify issuance of the writ. *Gulfstream Aerospace Corp. v. Mayacamas Corp*., 485 U.S. 271, 289 (1988); *see also In re Leeds*, 951 F.2d 1323, 1323 (D.C. Cir. 1991). Mandamus is available only if: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." *In re Medicare Reimbursement Litigation*, 414 F.3d 7, 10 (D.C. Cir. 2005). For these reasons, the defendant's Motion for a Writ of Mandamus is improper and should be denied.

The government instead treats the defendant's Motion for a Writ of Mandamus as (1) a motion for recusal and (2) a motion for a change of venue. Those motions also lack merit and should be denied.

**II.    Defendant's request for recusal is improper, and unfounded**

The defendant claims that, according to the Attorney General of the District of Columbia, "every resident of Washington, D.C., is a personal victim, directly or indirectly, of" the events of January 6, 2021. ECF No. 60, pg. 3. Therefore, according to the defendant, no Judge who resides

in the District of Columbia can preside over any case arising out of the January 6, 2021 riots.[3] The government notes that this Court, the Honorable Judge Amit P. Mehta, is in fact the Judge presiding over the civil suit *District of Columbia v. Proud Boys International, L.L.C. et. al.,* No. 1:21-cv-03267 (AJM). The government further notes that the defendant, Eric Clark, is not a named party in that litigation. The government further notes that no party in that civil litigation has moved to recuse the Court from presiding over the case.

Recusal "must be limited to truly extraordinary cases where … the judge's views have become 'so extreme as to display clear inability to render fair judgment[.]'" *Cobell v. Kempthorne*, 455 F.3d 317, 332 (D.C. Cir. 2006) (*quoting Liteky v. United States*, 510 U.S. 540, 551 (1994)). Judicial rulings alone "almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555. A judge's remarks "that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," unless they "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id*. "Not establishing bias or partiality … are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Id*. at 555-56. The threshold showing for bias "is high," and "must be based on an abiding impression left from a reading of the entire record, … not from particular comments or rulings considered in isolation." *United States v. Edmond*, 52 F.3d 1080, 1099 (D.C. Cir. 1995) (citation and quotation marks omitted).

---

[3] The defendant's argument is actually much broader, and the defendant further claims that anyone who was present in the District of Columbia is a victim and could not preside over the case, as well as "visiting judges who are working within the city." ECF No. 60, pg. 5. According to the defendant, apparently no judge can preside over the January 6, 2021 cases.

The defendant's litany of complaints falls far short of establishing that this Court, Judge Mehta presiding, has "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky*, 510 U.S. at 555. More significantly, the defendant does not allege that this Court is personally biased but, rather, relies exclusively upon the claim that the Court, and all January 6 Courts, are "victims" as defined by the Attorney General for the District of Columbia. In addition to citing language from a single civil lawsuit, the defendant primarily rests his argument on the generalized economic harm done to all District residents by the events of January 6, 2021. ECF 60 at 3 ("every resident who pays taxes directly or through rent to a landlord (residential or commercial) and the services that the city is able to provide are reduced due to the impact on the city's budget."). This argument misunderstands the nature of the District of Columbia, which is not only a local municipality but also a federal district that receives more than a quarter of its gross income from the federal government. *See* D.C. FY 2023 Budget Approved Operating Budget Executive Summary at 1-9, 1-10 (*available at* https://app.box.com/s/fqjbsheieqj4im029sjbhv16h4yqgiue) (listing $4.7 B in Federal Grants & Medicaid, $0.1 B in Federal Payments, and $0.4 B in Federal Funds for Local Revenue Replacement among $20 B in gross receipts). Thus, economic harm to the District of Columbia impacts all American taxpayers. This also discounts the very real economic impact the events of January 6 had directly on federal agencies such as the United States Capitol Police, as well as the damage associated with repairing the United States Capitol Building and Grounds, who also rely on taxes derived from the entire country. Using the defendant's standard of recusal, there would be no American taxpayer who could preside over or serve as the trier of fact for his trial. Absent any more specific claim, the government suggests, the defendant's claim fails as a matter of law.

*See Liteky*, 510 U.S. at 555 ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion."). The claim should be rejected.

### III. Defendant's request for a transfer of venue is not ripe, and not appropriate here

No trial date has been set, and the defendant has not elected to proceed with a jury or bench trial. The defendant claims that "extraordinary local prejudice in Washington, D.C., will prevent the defendant from obtaining a fair trial in the district of the offense" and therefore due process requires transferring the case to another District. ECF No. 60, pg. 18. The defendant makes no claim against this Court personally, and offers no support or claim that this Court is personally biased against him.[4] Rather, as in his claim for recusal, the defendant refers generally to claims that because the events took place in the District of Columbia, the cases "cannot be heard before any of the Judges of the U.S. District Court for the District of Columbia." ECF No. 60, pg. 16.

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district

---

[4] To the extent that the defendant's motion for transfer under Fed. R. Crim. Proc. 21(a) is based upon any personal bias by the Court, it is more appropriately a motion for recusal. *See United States v. Johnson*, 47 F.3d 272, 276 (8th Cir. 1995) ("Although Johnson fashioned this argument as a motion for transfer, see Fed. R. Crim. P. 21(a), in essence, he has suggested that the district court should have recused itself"). Defendant makes at least one bizarre claim that "Similar to the relationship between District Judges and his wife in the case at bar." ECF No. 60, pg. 23. The government interprets this unexplored claim as an editing, copying, or grammatical error.

7

if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

### A. The Characteristics of the District of Columbia's Jury Pool Do Not Support a Change of Venue.

The defendant contends that a D.C. jury cannot be impartial because of various characteristics of the District's jury pool. *See* ECF No. 60, pg. 30, *see also* ECF No. 49. None of these claims have merit.[5]

### A. The District of Columbia's political makeup does not support a change of venue.

---

[5] The government references the defendant's earlier Motion to Transfer Venue for completeness purposes, and because those arguments, which are repeated somewhat in the present motion, more coherently follow other motions for a transfer of venue. For example, in the pleading filed at ECF No. 60, the defendant argues for a transfer of venue, in part, because "Petitioner, with well-documented showings of extra-judicial bias and conflicts of interest by District Judges, filed a timely affidavit and that of ethics expert Professor Ronald Rotunda in an attempt to have District Judges remove himself from the proceedings, as provided by 28 U.S.C. § 144. *See* Exhibits 1, 2." ECF No. 60, pg. 35. No affidavits or exhibits were filed with the defendant's motion, and Professor Ronald Rotunda died in 2018, three years before the events at the Capitol. *See* https://www.law.com/nationallawjournal/2018/03/19/ronald-rotunda-brilliant-dynamo-of-con-law-and-legal-ethics-dies-at-73/

The defendant has argued that he cannot obtain a fair trial in the District of Columbia because more than 90% of its voters voted for the Democratic Party candidate in the 2020 Presidential Election. ECF No. 49, at 6. The *en banc* D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively. *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part). The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue." *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here. To be sure, *some* potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims. But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire. This Court should not presume that every member of a particular political party is biased simply because this case has a political connection. Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted

9

to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute." *Connors v. United States*, 158 U.S. 408, 414 (1895). The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial." *Haldeman*, 559 F.2d at 70.

To the contrary, as the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases. High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, Roger Stone, and Steve Bannon have all been tried in the District. *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020); *United States v. Bannon*, No. 210-cr-670 (CJN). Indeed, the Court in *Stone* rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone." 2020 WL 1892360, at *30-31. Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

    **B.**    **The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.**

The defendant contends that a change of venue is warranted based on pretrial publicity. ECF 49, at 7. "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*,

58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in

11

other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same). In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition

of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to the defendant's contention, those factors do not support a presumption of prejudice in this case.

The government also notes that the defendant has not identified a single news story that features, or identifies, him.

### i. Nature of the pretrial publicity

Nor does this case involve an inadmissible "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice. As in *Skilling* and *Haldeman*, the news coverage of Clark is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.* Indeed, Clark does not cite to a single news article that specifically discusses his role in January 6.

The defendant asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6. Mot. at 9. But even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*, 559 F.2d at 61. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 800 people. The Court can guard against any spillover prejudice from the broader coverage of

13

January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)).

### ii. Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, 20 months have already elapsed since the events of January 6, and more time will elapse before trial. This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat." *Skilling*, 561 U.S. at 383.

### iii. The jury verdict

Because Clark has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial

whether the record supports a finding of actual or presumed prejudice. In short, none of the *Skilling* factors supports the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

### IV. The January 6-Related Jury Trials That Have Already Occurred Have Demonstrated the Availability of a Significant Number of Fair, Impartial Jurors in the D.C. Venire.

At this point, multiple January 6 cases have proceeded to jury trials, and the Court in each of those cases has been able to select a jury without undue expenditure of time or effort. *See Murphy*, 421 U.S. at 802-03 ("The length to which the trial court must go to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality."); *Haldeman*, 559 F.2d at 63 (observing that "if an impartial jury actually cannot be selected, that fact should become evident at the voir dire"). Instead, the judges presiding over those trials were able to select a jury in one or two days. *See United States v. Reffitt*, 21-cr-32, Minute Entries (Feb. 28 and Mar. 1, 2022); *United States v. Robertson*, 21-cr-34, Minute Entry (Apr. 5, 2022); *United States v. Thompson*, 21-cr-161, Minute Entry (Apr. 11, 2022); *United States v. Webster*, No. 21-cr-208, Minute Entry (Apr. 25, 2022); *United States v. Hale-Cusanelli*, 21-cr-37, Minute Entry (May 23, 2022); *United States v. Williams*, 21-cr-377, Minute Entry (June 27, 2022); *United States v. Bledsoe*, No. 21-cr-204, Minute Entry (July 18, 2022). And, using the first five jury trials as exemplars, the voir dire that took place undermines the defendant's claim that prejudice should be presumed.

In *Reffitt*, the Court individually examined 56 prospective jurors and qualified 38 of them (about 68% of those examined). *See Reffitt* Trial Tr. 521. The Court asked all the prospective jurors whether they had "an opinion about Mr. Reffitt's guilt or innocence in this case" and whether they had any "strong feelings or opinions" about the events of January 6 or any political beliefs that it would make it difficult to be a "fair and impartial" juror. *Reffitt* Trial Tr. 23, 30. The Court

15

then followed up during individual voir dire. Of the 18 jurors that were struck for cause, only nine (or 16% of the 56 people examined) indicated that they had such strong feelings about the events of January 6 that they could not serve as fair or impartial jurors.[6]

In *Thompson*, the Court individually examined 34 prospective jurors, and qualified 25 of them (or 73%). *See Thompson* 4-11-22 Tr. 169, 171, 180, 189, 192. The court asked the entire venire 47 standard questions, and then followed up on their affirmative answers during individual voir dire. *Id.* at 3-4, 34. Of the nine prospective jurors struck for cause, only three (or about 9% of those examined) were stricken based on an inability to be impartial, as opposed to some other cause.[7]

Similarly, in *Robertson*, the Court individually examined 49 prospective jurors and qualified 34 of them (or about 69% of those examined). *See Robertson* Trial Tr. 302. The Court asked all prospective jurors whether they had "such strong feelings" about the events of January 6 that it would be "difficult" to follow the court's instructions "and render a fair and impartial verdict." *Id.* at 14. It asked whether anything about the allegations in that case would prevent prospective jurors from "being neutral and fair" and whether their political views would affect their ability to be "fair and impartial." *Id.* at 13, 15. The Court followed up on affirmative answers

---

[6] For those struck based on a professed inability to be impartial, see *Reffitt* Trial Tr. 49-54 (Juror 328), 61-68 (Juror 1541), 112-29 (Juror 1046), 172-73 (Juror 443), 174-78 (Juror 45), 202-09 (Juror 1747), 223-35 (Juror 432), 263-74 (Juror 514), 358-69 (Juror 1484). For those struck for other reasons, see *Reffitt* Trial Tr. 168-172 (Juror 313, worked at Library of Congress), 209-24, 281 (Juror 728, moved out of D.C.), 284 (Juror 1650, over 70 and declined to serve), 340-51 (Juror 548, unavailability), 382 (Juror 715, anxiety and views on guns), 398 (Juror 548, medical appointments), 441-43 (Juror 1240, health hardship), 453-65 (Juror 464, worked at Library of Congress), 465-81 (Juror 1054, prior knowledge of facts).

[7] For the three stricken for bias, see *Thompson* 4-11-22 Tr. 52 (Juror 1242), 85 (Juror 328), 158 (Juror 999). For the six stricken for hardship or inability to focus, see *id.* at 43 (Juror 1513), 44 (Juror 1267), 49 (Juror 503), 40 (Juror 1290), 92 (Juror 229), 109 (Juror 1266).

to those questions during individual voir dire. Of the 15 prospective jurors struck for cause, only nine (or 18% of the 49 people examined) indicated that they had such strong feelings about the January 6 events that they could not be fair or impartial.[8]

In *Webster*, the Court individually examined 53 jurors and qualified 35 of them (or 66%). *Webster* 4-26-22 AM Tr. 6, though it later excused one of those 35 based on hardship, *Webster* 4-25-22 PM Tr. 217-18. The Court asked all prospective jurors whether they had "strong feelings" about the events of January 6 or about the former President that would "make it difficult for [the prospective juror] to serve as a fair and impartial juror in this case." *Webster* 4-25-22 AM Tr. 19. During individual voir dire, the Court followed up on affirmative answers to clarify whether prospective jurors could set aside their feelings and decide the case fairly. *See, e.g., id.* at 32-33, 41-42, 54-56, 63, 65-66. Only 10 out of 53 prospective jurors (or about 19%) were stricken based on a professed or imputed inability to be impartial, as opposed to some other reason.[9] The *Webster* Court observed that this number "was actually relatively low" and therefore "doesn't bear out the concerns that were at root in the venue transfer motion" in that case. *Webster,* 4-26-22 AM Tr. 7.

---

[8] For those struck based on a professed inability to be impartial, see *Robertson* Trial Tr. 26-34 (Juror 1431), 97-100 (Juror 1567), 121-30 (Juror 936), 136-42 (Juror 799), 160-71 (Juror 696), 189-93 (Juror 429), 256-65 (Juror 1010), 265-68 (Juror 585), 287-92 (Juror 1160). For those struck for other reasons, see *Robertson* Trial Tr. 23-26 (Juror 1566, hardship related to care for elderly sisters), 83-84 (Juror 1027, moved out of D.C.), 156-60 (Juror 1122, language concerns), 193-96 (Juror 505, work hardship), 245-50 (Juror 474, work trip); 279-82 (Juror 846, preplanned trip).

[9] Nine of the 19 stricken jurors were excused based on hardship or a religious belief. *See Webster* 4-25-22 AM Tr. 46 (Juror 1464), 49-50 (Juror 1132), 61 (Juror 1153), 68 (Juror 951), 78 (Juror 419); *Webster* 4-25-22 PM Tr. 102-04, 207, 217 (Juror 571), 188 (Juror 1114), 191 (Juror 176), 203-04 (Juror 1262). Of the ten other stricken jurors, three professed an ability to be impartial but were nevertheless stricken based on a connection to the events or to the U.S. Attorney's Office. *See Webster* 4-25-22 AM Tr. at 58-60 (Juror 689 was a deputy chief of staff for a member of congress); *Webster* 4-25-22 PM Tr. at 139-41 (Juror 625's former mother-in-law was a member of congress); 196-98 (Juror 780 was a former Assistant U.S. Attorney in D.C.).

In *Hale-Cusanelli*, the Court individually examined 47 prospective jurors and qualified 32 of them (or 68%). *Hale-Cusanelli* Trial Tr. 226, 231. The Court asked prospective jurors questions similar to those asked in the other trials. *See id.* at 72-74 (Questions 16, 20). Of the 15 prospective jurors struck for cause, 11 (or 23% of those examined) were stricken based on a connection to the events of January 6 or a professed inability to be impartial.[10]

In these first five jury trials, the percentage of prospective jurors stricken for cause based on partiality is far lower than in *Irvin*, where the Supreme Court said that "statement[s] of impartiality" by some prospective jurors could be given "little weight" based on the number of other prospective jurors who "admitted prejudice." *Irvin*, 366 U.S. at 728. In *Irvin*, 268 of 430 prospective jurors (or 62%) were stricken for cause based on "fixed opinions as to the guilt of petitioner." *Id.* at 727. The percentage of partiality-based strikes in these first five January 6-related jury trials—between 9% and 23% of those examined—is far lower than the 62% in *Irvin*. The percentage in these cases is lower even than in *Murphy*, where 20 of 78 prospective jurors (25%) were "excused because they indicated an opinion as to petitioner's guilt." *Murphy*, 421 U.S. at 803. *Murphy* said that this percentage "by no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." *Id.* As in *Murphy*, the number of prospective jurors indicating bias does not call into question the qualifications of others whose statements of impartiality the Court has credited.

Far from showing that "an impartial jury actually cannot be selected," *Haldeman*, 559 F.2d at 63, the first five January 6-related jury trials have confirmed that voir dire can adequately screen

---

[10] *See Hale-Cusanelli* Trial Tr. 62 (Juror 499), 67-68 (Juror 872), 84-85 (Juror 206), 92-93 (Juror 653), 124-25 (Juror 1129), 152 (Juror 182), 156 (Juror 176), 182 (Juror 890), 197-98 (Juror 870), 217 (Juror 1111), 224 (Juror 1412). For the four jurors excused for hardship, *see id.* at 77-79 (Juror 1524), 99 (Juror 1094), 132 (Juror 1014), 151 (Juror 899).

out prospective jurors who cannot be fair and impartial, while leaving more than sufficient qualified jurors to hear the case. The Court should deny the defendant's request for a venue transfer and should instead rely on a thorough voir dire to protect the defendant's right to an impartial jury.

## **CONCLUSION**

For the foregoing reasons, the defendant's Motion for a Writ of Mandamus should be denied. Additionally, any claim for recusal and/or a transfer of venue should also be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

　　　*/s/ James D. Peterson*
James D. Peterson
Special Assistant United States Attorney
Bar No. VA 35373
United States Department of Justice
1331 F Street N.W. 6th Floor
Washington, D.C. 20530
Desk: (202) 353-0796
Mobile: (202) 230-0693
James.d.peterson@usdoj.gov


　　　*Eric Boylan*
Eric Boylan
DOJ-USAO
US Attorney's Office, D.C.
601 D Street NW
Washington DC, DC 20001
(202) 252-7215
Email: eric.boylan@usdoj.gov