**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-CR-409 (APM)** |
| **v.** | : | |
| | : | |
| **ERIC CLARK,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Eric Clark to 12 months of incarceration, which is within the Guidelines range of ten to sixteen months, 12 months of supervised release, 60 hours of community service, a fine of $16,879, and $500 in restitution.

**I.     Introduction**

Defendant Eric Clark, who is 47 years old, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Clark was convicted at trial of violations of: 18 U.S.C. § 1752(a)(1) (entering and remaining in a restricted building or grounds) (Count One); 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds) (Count Two); 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three); and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Four). The government's sentencing recommendation is supported by (1) Clark's conduct on January 6, including his breach of the Capitol amidst the violence on the Capitol's west side and decision to enter a Senator's private office, (2) his lack of respect for the rule of law, as reflected by his conduct on January 6 and his decades-long criminal history, and (3) his complete failure to accept responsibility or express remorse for his crimes on January 6.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Clark's crime support a sentence of 12 months of incarceration in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol contained in the Statement of Facts. *See* ECF No. 1-1.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

*Defendant Clark's Role in the January 6, 2021 Attack on the Capitol*

On January 3, 2021, Clark carpooled from Kentucky to Washington, D.C., with people he met on the internet to attend then-President Donald Trump's rally scheduled for January 6. On January 5, 2021, the day before the rally, Clark walked around Washington, D.C. and took pictures of the city, including a picture of the U.S. Capitol Building that captured the snow fencing and area-closed signs already erected around its perimeter.

On January 6, 2021, after attending the rally, including President Trump's speech, Clark walked to the Capitol. During much of his time on January 6, he wore a black-and-white Guy Fawkes mask, including while he was on Capitol grounds. *See Image 1.*



*Image 1: An image of Clark in the Guy Fawkes mask he wore on January 6. (Trial Exhibit 616).*

When Clark arrived on Capitol grounds, he walked immediately to the very front of the crowd that was facing off with police officers on the Capitol's west side. *See Image 2.* There, he witnessed confrontations between the police and the mob, including tear gas being deployed and objects being thrown by the mob at police.



*Image 2: Clark, circled in yellow, standing face-to-face with a line of police officers on the West Plaza. (Screenshot from Trial Exhibit 604 at 0:16.)*

After other rioters broke through the police line, Clark walked closer to the Capitol Building. He climbed a set of stairs to access the Upper West Terrace where he took videos and pictures using his cellphone.

At approximately 2:48 p.m., Clark was part of a group of rioters that forced their way into the Capitol Building through the Senate Wing Door. The crowd pushed their way past police officers and into the building while a blaring alarm sounded from the broken door.

At the moment he entered the building, Clark came face to face with a police officer who held his open palm up to Clark, signaling him to stop. *See Image 3.*



*Image 3: Clark, circled in yellow, just after storming into the U.S. Capitol on January 6, as he stands across from a Capitol Police officer with his open palm raised. (Screenshot from Trial Exhibit 400 at 1:55.)*

Nevertheless, Clark entered the building and stayed inside for approximately 24 minutes. While inside, Clark removed his mask, took selfies, and was smoking what appeared to be marijuana. He joined in the rowdy chanting of the crowd.

Later, Clark walked down a hallway and into the Crypt. There, he walked past police officers who were trying to get him to leave the building. Clark refused. Instead, as captured on a video he took on his cellphone, Clark said, "No, we're not trying to get out. This way! This way! They're pushing you out of the building. This way! They want us to go out of the building. I'm not going there." (*See* Trial Ex. 513.)

Clark then walked back down the same hallway, where he entered the private hideaway office of Senator Jeff Merkley. There, he used his phone to film other rioters who were chanting, banging on a table, and smoking. *See Image 4.*



*Image 4: Clark, circled in yellow, inside the private office of a U.S. Senator, holding up his cellphone to capture video as other rioters smoke and jeer. (Screenshot from Trial Exhibit 611 at 0:14.)*

Clark finally made his way back to the area near the Senate Wing Door and left the Capitol Building through the same door he entered at approximately 3:12 p.m.

*Clark's Post-Arrest Interview*

Clark was arrested on May 4, 2021, and spoke to the arresting agent that day. During the interview, Clark expressed no remorse for his actions, and instead claimed that January 6 was a "staged event," and that police officers moved barriers back and were waiting for a specified time to let people into the U.S. Capitol building.

*Public Statements after January 6*

Clark also gave several interviews to internet media outlets following January 6. In one interview with a web-based talk show called "Sovereign Souls," Clark continued to exhibit a

complete lack of remorse and propagated more false information about January 6.[2] Although he admitted in the interview that he saw the smoke of a fire extinguisher and had pepper spray on him, he said that when he first arrived on Capitol grounds he could tell "something's been staged," and knew it was a "preplanned, staged event." Clark claimed that Ray Epps (a January 6 defendant who is a frequent target of January 6 conspiracy theories) told him, "We got to hold the crowd back a little bit longer or they're gonna fuck up the plan." Clark also claimed that the police officers voluntarily backed off and let people through.

Clark has also brought a frivolous civil lawsuit against January 6 defendant Ray Epps and the Assistant United States Attorney who prosecuted the Epps case. *See Clark v. Epps, et al.*, 24-cv-014-DAK-JCB (D. Utah).

*Social Media Posts*

After January 6, and during the pendency of this case, Clark maintained a page on Twitter that displayed his mugshot photo as an avatar image and called himself "Eric Clark (J6anon)." *See Image 5*. The page contained hundreds, if not thousands of posts, most of which related to January 6. The great majority of the posts contained videos, including footage from U.S. Capitol Police Closed Circuit T.V., police body worn cameras, and open-source videos. At one time, Clark claimed to have posted 2000 videos related to January 6. *See Image 6*.[3]

---

[2] Justice in Jeopardy (SovSouls), *SOVEREIGN SOULS Ep. 30 "Compelled By GOD: Three J6 Stories,"* https://rumble.com/v1hn30b-sovereign-souls-ep.-30-compelled-by-god-three-j6-stories.html.

[3] While the Clark's Twitter page was active even as late as the days following his trial and conviction, the page appears to have been taken down as of the writing of his memo.



*Images 5 and 6: Screenshots from Clark's Twitter page in which he glorifies his status as a January 6 defendant.*

Clark used the account to spread false information about the events of January 6 by saying, for instance, "Leo's [law enforcement officers] let us in." *See Image 7.*



*Image 7: In a Twitter post, Clark falsely claims that law enforcement officers let rioters into the Capitol on January 6.*

Clark also used the Twitter page to try to make money from his notoriety as a January 6 defendant. He solicited donations in multiple posts, including asking the public to "help me continue my work," referring to himself as a "J6 investigator," and posting links to a givesendgo.com page, a Cash App account, and a Venmo account. *See Image 8.* He also included links to those accounts in his bio at the top of his Twitter page.



*Image 8: Clark links fundraising websites to his Twitter page.*

Moreover, Clark continues to maintain an active fundraising webpage on the crowdfunding site GiveSendGo.[4] *See Image 9.*



*Image 9: A screenshot from Clark's GiveSendGo page, showing more than $16,000 in donations raised.*

On the webpage, he calls himself a "Christian J6 def and patriot," and solicits donations based on his status as a participant in the January 6 riot. Some of the postings on the page say that Clark intends to use the donations to aid in his criminal trial, saying, for example, "I need your help to carry on this legal fight against the US Government to win back freedom and justice for all of us." At the same time, Clark also claims that these funds will support his civil lawsuit against Epps and the prosecuting Assistant United States Attorney. As of the writing of this memo, the page shows Clark has raised $16,879.

---

[4] GiveSendGo, https://www.givesendgo.com/G2FJH (last visited May 31, 2024).

*The Charges and Plea Agreement*

On January 31, 2024, Clark was convicted following a jury trial on all four Counts of the Information: 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds) (Count One); 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds) (Count Two); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds) (Count Three); and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing, in a Capitol Building) (Count Four).

## III.    Statutory Penalties

Clark now faces sentencing on Counts One through Four. On each of Counts One and Two, Clark faces up to one year of imprisonment and a fine of up to $100,000. 18 U.S.C. §§ 1752(b)(2), 3571(b). On each of Counts Three and Four, Clark faces up to six months of imprisonment and a fine of up to $5,000. 40 USC §§ 5109(b), 3571(b).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR as to Count Two, but the PSR erroneously does not include a Guidelines analysis for Count One. *See* PSR ¶¶ 27-45.[5] The full Guidelines analysis follows:

Count One (18 U.S.C. § 1752(a)(1)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Total Adjusted Offense Level | 6 |

The government also agrees with the Sentencing Guidelines calculation set forth in the

Count Two (18 U.S.C. § 1752(a)(2)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Total Adjusted Offense Level | 10 |

The offenses that Clark violated under 40 U.S.C. § 5104(e)(2)(D) and (G), Counts Three and Four, are Class B misdemeanors; therefore, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

The U.S. Probation Office assessed, and the government agrees, that Clark has not clearly demonstrated acceptance of responsibility for the offenses of conviction and is not eligible for any reduction for acceptance of responsibility. PSR ¶ 43. Further, the U.S. Probation Office correctly determined that Section 4C1.1 does not apply in this case because Clark received criminal history points. PSR ¶ 44.

---

[5] Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes (see PSR ¶ 34) that Counts 1 and 2 group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

The U.S. Probation Office calculated Clark's criminal history as Category III. PSR ¶ 59. Clark's total adjusted offense level is 10, and his corresponding Guidelines imprisonment range is ten to sixteen months.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 12 months of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Clark's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Clark, the absence

of violent or destructive acts is not a mitigating factor. Had Clark engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Clark's case is his conduct on January 6. Clark was part of the violent scene on the west front, went inside a Senator's private office, and was smoking inside the Capitol. Far from a mere bystander, Clark contributed significantly to the chaos that took place on January 6.

Clark has also exhibit a deep-seated lack of respect for the rule of law, as reflected in his actions on January 6 and in his decades-long criminal history. On January 6, Clark stormed into the Capitol despite seeing police lined up on the West Plaza amid tear gas and pepper spray. Moreover, Clark refused to leave the Capitol even when he knew officers wanted him to leave the building. Paired with his long history of criminal behavior, Clark's January 6 conduct shows a man who does not respect the law.

Clark's utter lack of remorse is another important factor. He has never expressed contrition for his actions—not in his post-arrest interview, not in his interview with the Probation Officer, and certainly not in any of his multitude of internet postings. To the contrary, Clark's continued use of social media to publicly champion the events of January 6, and dispute his guilt and the findings of this Court, suggests that he is proud of, and stands by, his actions.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Clark's History and Characteristics

Clark is 47 years old, lives in Pensacola, Florida, and is currently employed as a groundskeeper. PSR ¶¶ 89-90. He briefly served in the United States Marine Corps, from 1994 until his discharge for bad conduct in 1995. PSR ¶ 88.

As set forth in the PSR, Clark has an extended history of a wide variety of criminal conduct stretching back more than two decades. Although Clark's history consists solely of misdemeanor violations, its long and varied history evidences his continued lack of respect for the rule of law—a lack of respect that that was evident on January 6.

Many of Clark's criminal violations may have been tied to his admitted history of drug abuse. But while Clark claims to have stopped using illicit drugs except for marijuana in 2018, his criminal violations did not cease. On January 6, well after the time Clark claims to have stopped using illicit drugs, he engaged in the criminal conduct at issue in this case.

Clark's criminal history includes violations for multiple crimes of dishonesty, including theft, PSR ¶ 48, possession of a forged instrument, PSR ¶¶ 49, 51, and giving an officer a false name, PSR ¶ 52. It also includes at least one violation for domestic violence, in which Clark was convicted of disorderly conduct when he used a potato peeler to cause a small cut on his wife's finger and grabbed a witness by the neck, PSR ¶ 56.

Clark also has violations for an assortment of other crimes such as: operating a vehicle on a suspended or revoked license, PSR ¶ 47; leaving the scene of an accident, PSR ¶ 50)=; possession of marijuana, PSR ¶ 53; failure to maintain insurance, PSR ¶ 54; possession of drug paraphernalia, that is, hypodermic needles, PSR ¶ 55; and indecent exposure, PSR ¶ 57. Clark also reported that he received a bad conduct discharge from the United States Marine Corps in 1995 for possession of methamphetamine and positive drug tests. PSR ¶ 88. He also has 12 other dismissed or uncharged criminal counts. PSR ¶¶ 61-66.

The PSR notes that Clark's "criminal history points all arise from misdemeanor offenses, including possession of marijuana," and the Court may depart downward "[p]ursuant to USSG §4A1.3, if the Court determines that the defendant's criminal history category substantially over-

represents the seriousness of the defendant's criminal history." PSR ¶ 141. But a downward departure would not be appropriate here. If anything, the criminal history calculation *understates* Clark's history of criminal culpability. Only one of the applicable crimes is solely for possession of marijuana, *see* PSR ¶ 53), while Clark's other crimes include giving a false name to a police officer, possession of hypodermic needles, and domestic violence, *see* PSR ¶¶ 52, 55, 56, 57. Further, a litany of other criminal conduct is not captured by the criminal history calculation, including at least six other incidents with nine other criminal charges, *see* PSR ¶¶ 47-57, in addition to 12 other dismissed or uncharged criminal counts, *see* PSR ¶¶ 61-66. Moreover, a departure is not warranted where there is a likelihood of recidivism, which is certainly present here as illustrated by Clark's extended history of criminal conduct. *See* U.S.S.G. § 4A1.3, cmt. background ("This policy statement authorizes the consideration of a departure from the guidelines in the limited circumstances where reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's criminal history or likelihood of recidivism . . . .").[6]

In short, if anything, Clark's criminal history category understates the seriousness of his criminal history and likelihood of recidivism. Clark's long history of criminal conduct demonstrates a very real need for specific deterrence in this case.

---

[6] Even if the Court were to disregard the single criminal history point that comes solely from a marijuana-possession violation, that would not change Clark's total criminal history calculation. Clark's criminal history merited a total of five criminal history points (including the one for marijuana possession), but he received only four points because the Guidelines allow a maximum of four points for sentences of less than sixty days. *See* PSR ¶ 58; USSG §4A1.1(c).

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a serious term of incarceration.

First, as discussed above, Clark's criminal history category of III, in conjunction with his long history of prior arrests and convictions, reveals a clear pattern of disrespect for the law. *See* Section IX(B), *supra.* None of Clark's many experiences with the criminal justice system deterred him from ignoring police officers and engaging in the serious criminal conduct he did on January 6.

Second, Clark's post-January 6 and post-trial conduct and statements are troubling. Clark has never taken any steps to denounce his actions on January 6, 2021, including to the Probation officer who conducted his PSR interview. Instead, he has used multiple internet platforms to spread false information about the events of January 6, disrespect the police officers who were there that day, and continue to deflect blame for his conduct. The Court should view any remorse Clark expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

With the 2024 presidential election approaching, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms. The Court must sentence Clark in a manner sufficient to deter him specifically, and others generally,

from going down that road again.

### E.   The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] This Court must sentence Clark based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Clark was found guilty of all four counts in the Information. Counts One and Two, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), and Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), are Class A misdemeanors. 18 U.S.C. § 3559. Counts Three and Four, Disorderly or Disruptive Conduct on the Grounds or in the Buildings of the United States Capitol, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating and Picketing in Any Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), are Class B misdemeanors. Although the Sentencing Guidelines apply only to Counts One and Two, the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply to all four counts.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-CR-314-TNM, Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines." (statement of Judge McFadden)). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-CR-31-FYP, Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021." (statement of Judge Pan)).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Stewart Parks*, 21-CR-411 (APM) presents an apt comparator for this case. In that case, this Court sentenced the defendant to eight months of imprisonment following a trial at which Parks was found guilty of the same four crimes as Clark (as well as one count of

misdemeanor theft). The facts of the two cases are similar: both defendants entered the Capitol through the Senate Wing Door, both stayed inside for a long period of time (40 minutes for Parks and 24 minutes for Clark). And while Parks traveled through a larger area within the Capitol, making his way to the Ohio Clock Corridor and the House Chamber entry, Clark went into a sensitive area of the building, the office of Senator Merkley. Although the Court found that Parks had testified falsely at trial, while Clark did not testify, Clark's lack of remorse and propagation of false information since January 6 show a similar lack of respect for the law in this case. The crucial difference between Parks and Clark is their criminal history. While Parks was eligible for a downward departure under U.S.S.G. § 4C1.1, Clark has a significant criminal history that demonstrates an enduring disrespect for the rule of law—a difference that supports the disparity between the eight-month sentence in that case and the 12-month sentence that is appropriate here.

Another comparator, from a different judge on this court, is *United States v. Russell Dean Alford*, 21-CR-263 (TSC), in which Judge Chutkan sentenced the defendant to 12 months of incarceration. Alford was found guilty after a trial of the same four charges as Clark. Their conduct was similar: both entered the Capitol with knowledge that they were not supposed to be there, both knew others gained entry to the building by force, and both lacked remorse for their actions or any appreciation for the effect of the events that day. While Alford received a 2-level enhancement for falsely testifying at his trial, he had no criminal history at all, while Clark's criminal history is significant, making a 12-month sentence equally appropriate here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Clark was

convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court . . . may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Clark to pay $500 in restitution for his convictions on Counts One and Two. This amount fairly reflects Clark's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $500 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII. Fine

Clark's convictions for violations of 18 U.S.C. § 1752(a)(1) (entering and remaining in a restricted building or grounds) (Count One), 18 U.S.C. § 1752(a)(2) (disorderly and disruptive

conduct in a restricted building or grounds) (Count Two), 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct on the grounds or in the buildings of the United States Capitol) (Count Three), and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in any Capitol building) (Count Four) subject him to a statutory maximum fine of $100,000 for Count 1, $100,000 for Count 2, $5,000 for Count 3, and $5,000 for Count 4. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).

The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4000 to $40,000. U.S.S.G. § 5E1.2(c).

A fine of $16,879 is appropriate in this case. As the PSR notes, the defendant maintains a crowd-funding GiveSendGo campaign where he glorified his conduct on January 6. PSR ¶ 102. A review of the site shows he has raised $16,879 as of the writing of this memo. Although Clark claimed that he planned to use the funds for his defense, he apparently did not: Clark represented

himself at trial and is represented by a public defender at sentencing. Clark should not be able to use the notoriety gained in the commission of his crimes to "capitalize" on his participation in the Capitol breach.[9]

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Clark to 12 months of incarceration, which is within the Guidelines range of ten to sixteen months, 12 months of supervised release, 60 hours of community service, a fine of $16,879, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Clark's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Eric W. Boylan*
Eric W. Boylan
Assistant United States Attorney
Texas Bar No. 24105519
Phone: 202-815-8608
Email: Eric.Boylan@usdoj.gov

Adam M. Dreher
Assistant United States Attorney
Mich. Bar No. P79246
Phone: 202-252-1706
Email: adam.dreher@usdoj.gov

601 D Street NW
Washington, D.C. 20530

---

[9] The government bases its recommended fine amount ($16,879) on the amount Clark has raised through his crowd-funding campaign. The government may seek to supplement its recommendation in the event that the amount of money raised increases before the sentencing hearing.